(87 Misc. Rep. 476)

### In re HERMANN'S WILL.

(Surrogate's Court, New York County. November 23, 1914.)

1. WILLS (§ 163*)—APPLICATION FOR PROBATE—UNDUE INFLUENCE—BURDEN OF PROOF.

    The burden of proving undue influence and conspiracy, alleged as grounds for denial of probate of a will, is on the contestants, which burden does not shift.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 388–402; Dec. Dig. § 163.*]

2. WILLS (§ 155*)—PROBATE—"UNDUE INFLUENCE."

    Undue influence, when alleged as a ground for denial of probate of a will, while involving elements of fraud and duress, is nevertheless· a special plea distinct from either; and while it imports moral coercion, distinct from duress, which is a physical wrong and primarily a matter of legal cognizance, undue influence in respect to testamentary acts postulates freedom of the will, and is established by any set of circumstances showing any coercion which subverts freedom of action on the part of the testator.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

    For other definitions, see Words and Phrases, First and Second Series, Undue Influence.]

3. WILLS (§ 155*)—EXECUTION—"COERCED."

    The word "coerced," as used in testamentary law, involving the execution of a will, means any pressure by which testator's action is restrained against his free will in the execution of his testament.

    [Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 375–381; Dec. Dig. § 155.*

    For other definitions, see Words and Phrases, First and Second Series, Coerce.]

4. WILLS (§ 161*)—EXECUTION—FRAUD—UNDUE INFLUENCE.

A will which results from fraud or force of any kind is in general invalid; but if the fraud or force clearly affects only a part of the testament, it does not necessarily invalidate the whole, though if there is doubt it may invalidate the entire will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. § 374; Dec. Dig. § 161.*]

5. WILLS (§ 166*)—EXECUTION—UNDUE INFLUENCE.

Undue influence may be proved in a will contest by indirect or circumstantial evidence, provided it has some relevancy to the issue.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

6. WILLS (§ 165*)—EXECUTION—UNDUE INFLUENCE—ACTION—DECLARATIONS OF TESTATOR.

On an issue of undue influence in a will contest, all actions and declarations of testatrix, from which her state of mind may be inferred at the time of the testamentary act, are admissible.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 415–420; Dec. Dig. § 165.*]

7. WILLS (§ 164*)—EXECUTION—UNDUE INFLUENCE—EVIDENCE—PRIOR TESTAMENTS.

On an issue of undue influence in a will contest, prior testaments executed by testatrix are relevant, since if the provisions are consistent with the will in question they tend to rebut the charge of undue influence, and if inconsistent and unexplained they tend to confirm it.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

8. WILLS (§ 164*)—UNDUE INFLUENCE—EVIDENCE—DECLARATIONS.

On an issue of undue influence in a will contest, evidence showing manner of life of testatrix and her relations with the persons accused of influencing her, together with their declarations, though not a part of the res gestæ, are admissible.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 403–414; Dec. Dig. § 164.*]

9. WITNESSES (§ 268*)—CROSS-EXAMINATION—CREDIBILITY—INDICTMENT.

Where an attorney, who had superintended the execution of testatrix's will, attacked for undue influence, volunteered on direct examination that he had been charged with crime, a question, asked him on cross-examination as to whether he had been indicted, was proper.

[Ed. Note.—For other cases, see Witnesses, Cent. Dig. §§ 931–948, 950; Dec. Dig. § 268.*]

10. EVIDENCE (§ 226*)—ADMISSIONS—DECLARATIONS—LEGATEES.

That a person charged with undue influence in a will contest is one of several legatees does not exclude evidence of his declarations relevant to such issue, at least if competent res gestæ.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 815–821; Dec. Dig. § 226.*]

11. WILLS (§ 120*)—EXECUTION—WITNESSES—REQUEST.

That the summons to attesting witnesses to a will was not tendered by testatrix, but by a legatee, is not fatal, if the testatrix ultimately or thereafter requested the witnesses present to sign their names as witnesses at the end of the will.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 314–317; Dec. Dig. § 120.*]

12. WILLS (§ 166*)—EXECUTION—UNDUE INFLUENCE—EVIDENCE.

In a will contest for alleged undue influence, evidence that an attesting witness, on being called to witness the will, asked if the paper was open for discussion, and, being informed by the attorney in attendance that it

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

was, entered into a colloquy, which resulted in his obtaining a legacy for a hospital in which he was interested, was cogent proof that the testatrix was easily susceptible of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

13. EVIDENCE (§ 222*)—RELEVANCY—ADMISSION.

Statements made by a party to a proceeding tending to prove his adversary's case are admissible as admissions.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 786–800, 803–808; Dec. Dig. § 222.*]

14. EVIDENCE (§ 260*)—CONSPIRACY—DECLARATIONS OF CO-CONSPIRATOR.

Where, in a will contest for undue influence, a conspiracy between the legatees is charged, the conspiracy must be proven at some stage of the case before the declarations of one conspirator may be used against another; and if this is proved then they are competent only when part of the relevant res gestæ, or when made in furtherance of the common object.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1010–1012; Dec. Dig. § 260.*]

15. EVIDENCE (§ 260*) — ADMISSIONS — RECEPTION OF EVIDENCE — ORDER OF PROOF.

In a court of probate, a conspiracy need not be first established before declarations of co-conspirators are received, it being sufficient if the conspiracy is made out at any stage of the case, and if there is a failure of proof thereof the declarations may be disregarded.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1010–1012; Dec. Dig. § 260.*]

16. EVIDENCE (§ 260*)—CONSPIRACY—OTHER WRONGFUL ACTS.

On an issue of conspiracy in a proceeding to probate a will, alleged to have been obtained by undue influence, other wrongful acts or schemes of the conspirators to obtain other property of the testatrix than that bequeathed to them by the will is admissible.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1010–1012; Dec. Dig. § 260.*]

17. WILLS (§ 165*)—CONTEST—EVIDENCE—DECLARATIONS OF TESTATRIX.

On an issue of undue influence in a will contest, declarations of testatrix, though not proof of the facts stated therein, are admissible to prove the condition of her mind, though of no weight as proof of undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 415–420; Dec. Dig. § 165.*]

18. WILLS (§ 166*)—UNDUE INFLUENCE—MISREPRESENTATIONS—SUFFICIENCY OF PROOF.

Evidence that certain persons, charged with undue influence in inducing testatrix to execute a paper offered for probate as her will, misrepresented to her that her previous will left her whole estate to two legatees mentioned therein, and to substantiate their claim caused extra sheets to be inserted in the old will, and by such misrepresentations induced her to execute the paper in question, such proof was sufficient to establish undue influence.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 421–437; Dec. Dig. § 166.*]

19. WILLS (§ 288*)—ESTABLISHMENT—BURDEN OF PROOF.

One seeking to probate an instrument as the will of a decedent has the burden of proving satisfactorily that the instrument propounded was in fact the last will and testament of the alleged testatrix.

[Ed. Note.—For other cases, see Wills, Cent. Dig. §§ 651, 652, 662, 664; Dec. Dig. § 288.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Application for probate of an instrument propounded as the last will and testament of Magdalena Hermann, deceased, to which George Hermann and another filed objections. Sustained, and probate denied.

See, also, 83 Misc. Rep. 283, 145 N. Y. Supp. 291.

Gustav Goodmann, of New York City, and Edward Carpel, of Philadelphia, Pa. (Gustav Goodmann, of New York City, of counsel), for proponent.

Moss, Laimbeer, Marcus & Wels, of New York City (Samuel Marcus, of New York City, of counsel), for certain legatees.

John B. Quintin, of New York City (James W. Osborne and Gilbert D. Lamb, both of New York City, of counsel), for contestants.

FOWLER, S. The testamentary paper of November 25, 1912, brought into court for probate, is objected to by George Hermann, one of the heirs at law and next of kin of Magdalena Hermann (formerly Mrs. Rollwagen), the alleged testatrix, and also by Henry Leis, claiming to be the executor of an earlier testamentary paper, purporting to be made by the same testatrix. The testimony offered in support of the probate and by contestants in opposition thereto is very voluminous. The hearings on the issues of fact began in October, 1913, and occupied for many months the sessions of this court. Portions of this testimony were taken subject to the usual objections, the validity of which may in a probate cause heard by the surrogate be often advantageously reconsidered by the surrogate before the close of the case. If any of such objections after deliberation are then found to be well taken, the testimony can be disregarded, without prejudice to the litigants. This is one of the advantages offered by the old practice in Surrogates' Courts, nevertheless, perhaps, fated to be superseded by more modern and less deliberate methods of procedure.

Much of the testimonial evidence taken doubtless relates to very trifling matters, but intermingled with such matters at long intervals possibly are facts of importance in a probate cause. In no other kind of litigation are the parties so anxious to unbosom, without reserve, their affairs and relations to the will in question. When the lines of evidence are not objected to, I do not feel it incumbent on me to question the character of the evidence, except on factum; for it, even if very unscientific evidence, often affords a fairly good picture of the surroundings of a testator, and the circumstances and atmosphere in which a testamentary paper is produced. To obtain an accurate picture of a situation or a thing not seen, considerable and trifling detail is often necessary in courts of this character.

Magdalena Hermann, whose will is contested, was at the time of its inception, as found in Rollwagen v. Rollwagen (see opinion, 63 N. Y. 504), nearly 80 years of age. In this cause her age is made even greater. She was the widow of one Frederick Rollwagen, and consequently had herself been the principal actor in a very leading case on the law of wills in this state. Rollwagen v. Rollwagen, 63 N. Y. 504. The judgment in that case gives with unsparing precision an account of the early life of our testatrix, Magdalena, and it need not, therefore,

be again reviewed at length. It is a matter of record. It there appears that Rollwagen, a wealthy old butcher by trade, had married his young housekeeper, this testatrix, and that his will in her favor was the product of undue influence imputed to her. The will in question in her favor was rejected. The judgment is most unsparing in its denunciation of her acts and conduct. Prior to her employment by Mr. Rollwagen, it appears Magdalena had been a saleswoman in a bakery establishment in this city. From the bakery and from penury she passed to affluence as the wife of Mr. Rollwagen. She seems to have been somewhat better educated than Rollwagen, who was adjudged to have been an illiterate. She could both read and write, and one witness testified to her fondness for the poetry of Goethe and Schiller: Notwithstanding Mrs. Rollwagen's censurable conduct in respect of her first husband's will, which is not precisely germane to this case, the evidence before me shows that her life thereafter was respectable, according to the standard of her environment. It was the ordinary life of an elderly retired workwoman of means, who preferred the quiet of her own dwelling to the outside distractions of a great city. It is, however, established that it was through her marriage to Frederick Rollwagen the testatrix derived the large estate which is now involved in this controversy. The final judgment in Rollwagen v. Rollwagen, just referred to, was rendered in the year 1876.

Between the year 1876 and the year 1912, the date of the paper propounded, Magdalena had been remarried, divorced her husband, one Hermann, and had finally entered on what I cannot help regarding as a somewhat pathetic and isolated or lonely old age. It was in her old age that she made the disputed testament. She then had no near relatives, and she was surrounded, in the main, by persons who as strangers in blood could have no great affection for an old woman living alone. The fortune which Mrs. Hermann had derived from her first husband, Mr. Rollwagen, obviously furnished her chief attraction in the eyes of many of those who were about her in her later life. The testimony reveals that the various wills of the old woman were matters of some anxiety to those who profited by them. Consequently, when a favorite was superseded in a later will by a rival, the old legatees evinced great solicitude, and the criticism became occasionally more liberal than firmly founded. Between legatees thus situated, who have no natural claims to the bounty of testatrix, there can be but little choice, and the law is free in such a case to view the testamentary act with dispassion and without danger of being influenced by those sympathetic or equitable considerations which in an unguarded moment may inadvertently creep into a will contest carried on between discarded children and other near relatives of a testator.

We are relieved in this case from the necessity of inquiring into the natural capacity of the aged testatrix to testamentate, for that is conceded in contestants' brief, and the contest is placed by counsel solely on the allegation of conspiracy, undue influence, and the weakness of old age, with the added contention that on the day of making the propounded paper the testatrix was induced to drink an excessive quantity of champagne, in order that the scheme of those accused of the

exercise of such influence might be the more readily consummated. There is some proof of this allegation of excessive alcoholism; but, taking into consideration the fact that testatrix came from a country where wine is regarded as an article of diet, and also the fact that she was surrounded by persons accustomed to partake of wine in her house on all occasions, I do not think the allegation merits any extended consideration, especially in view of the contradictory testimony before me on this point. There is no sufficient evidence that at the moment of making her will, or at any other time, Mrs. Hermann was incompetent by reason of a want of sobriety.

[1] The pleas, allegations, or objections interposed to the probate are undue influence and conspiracy. On these pleas, objections, or allegations the contestant alleging them has, in this state, the burden of proof and the onus of sustaining it. This burden does not shift, it is said. Matter of Will of Kindberg, 207 N. Y. 220, 228, 229, 100 N. E. 789; Matter of Will of Falabella, 139 N. Y. Supp. 1003; Matter of Will of Gedney, 142 N. Y. Supp. 157, 160. While this rule governing burden of proof in probate cases is being rapidly repudiated in many states (Herring v. Watson [Ind. Sup.] 105 N. E. 900; Steinkuehler v. Wempner, 169 Ind. 154, 81 N. E. 482, 15 L. R. A. [N. S.] 673), such is now the rule in this state in reference to both procedure and proof, or the weight of evidence, on an allegation of undue influence.

Pleas or allegations of undue influence have been so often before courts of justice that, as I have often stated, unless something new can be added to the discussion, there is little justification for repetition or amplification of settled authority. Matter of Will of Van Ness, 78 Misc. Rep. 598, 139 N. Y. Supp. at page 492. In no reported case that I have ever seen, however, are the final elements of undue influence discussed, or even traced to their source. Therefore, at the risk of appearing elementary and commonplace, I shall, for the purpose of precision in the discussion in this case, endeavor to supplement distinctions, perhaps sufficiently apparent to others, but certainly not always noticed in the reported adjudications.

[2] Undue influence in a court of probate, although it may involve elements of fraud and duress, for it is protean in character, is nevertheless now an allegation or plea distinct from a plea of fraud or duress. Sir John Nicholl's predication in Williams v. Gonde, 1 Hagg. at page 596, "that undue influence must be of the nature of fraud or duress," is, at the present day, inconclusive. Fraud, which includes misrepresentation, is always the subject of a separate plea in the modern English probate practice. In that practice a plea or allegation of undue influence raises a question of coercion, and that only. Lord Penzance in Parfitt v. Lawless (1872) 2 P. & D. at page 471; Lefton v. Hopwood (1855) 1 F. & F. 578; Lovett v. Lovett (1857) 1 F. & F. 581. While it may be true that undue influence can be regarded as a species of the genus fraud, undue influence has become in probate law sufficiently differentiated to be regarded in the catalogue of wrongs as a distinct genus. See Anson on Contracts, 219. It is important to correct reasoning that fraud be distinguished from undue influence.

Oftentimes fraud is confounded in the books with undue influence, when the two things are in law distinct wrongs, proceeding on different principles. The testamentary common law, which is undoubtedly a part of our common law by constitutional reservation (Matter of Will of Smart, 84 Misc. Rep. 336, 145 N. Y. Supp. 838, 840; Matter of Martin, 80 Misc. Rep. 17, 141 N. Y. Supp. 784, 791), observes the distinction between undue influence and fraud or duress.

Undue influence in this court, while it always imports moral coercion, is also distinct from "duress," as interpreted in the courts of common law and equity, where duress consists in menace or actual or threatened physical violence or imprisonment. Duress is a physical wrong; coercion, a moral wrong. Where duress is established in law or in equity, no consent of a testator at all is possible. Undue influence in this court differs from duress in many particulars. Duress is primarily a matter of legal cognizance.

In equity an allegation of undue influence is a well-known allegation in suits to rescind contracts or to enforce specific performance of contracts, and the rules laid down in equity, in so far as they relate to the invasion of a "freedom of the volition of a contracting party," are very analogous or similar to the rules laid down in the testamentary common law in relation to freedom of testators' wills in respect of testamentary acts procured from them by undue influence. The rules of the testamentary common law are, however, naturally more specific or concrete for our purposes than those familiar to equity practitioners, and in this court it is the testamentary common law which is primarily controlling in respect of undue influence exercised over testators. Both Anson and Pollock, in their justly celebrated treatises on Contracts, make some very discriminating comments on the principles relating to fraud and undue influence as applied in the realm of contracts or to gifts inter vivos. But it is not from such sources that the testamentary common law derives its principles governing undue influence.

What is undue influence in respect of testamentary acts and dispositions has been stated to be a question difficult to answer in the abstract. Doubtless definition is always a difficult logical process. Legal definitions in particular are not usually well regarded (Swinburne, 6), as they are generally a posteriori and involve at some stage the inductive process and not the deductive process familiar to a priori disciplines. The vice of principles or definitions arrived at by incomplete induction is well understood, for better reasons than those given by Swinburne. But the a priori definitions of testamentary law are different. In so far as the legal definition of undue influence is a priori, it is recognized in testamentary common law, which was built up originally by scholastic lawyers trained in the civil law and the old logical disciplines.

Undue influence in testamentary law postulates freedom of the will, or, in more modern philosophical verbiage, that a testator's volition is indeterminate. Now just at this point testamentary law touches some of the deepest principles in the philosophies of all the ages. Freedom of the will (libertas arbitrii) is conceded to be one of the profoundest

problems in all departments of metaphysics, and yet it determines, not only many principles of testamentary law, but all theories of life and morality. Testamentary law, which, as stated above, is scholastic in origin, takes no note of modern philosophical doubts on freedom of the will, and it invariably presupposes a testator's capability of self-determination, or, in other words, the absolute and inherent freedom of his disposing mind or will. Testamentary common law, then, proceeds to determine what acts and things subvert or invade the freedom of the will of a testator, so as to vitiate his testamentary acts. It is interesting to note that the scholasticism of the canonists, or the dual or Aristotelian school of philosophy, still influences all our testamentary common law, and to my mind it is fortunate for our jurisprudence that it has been so. If we were to adopt a more modern philosophy, and reject the doctrine of freedom of the will, testamentary law would have to be entirely reconstructed.

[3] In order that a testamentary act be valid, the testamentary common law requires, and has always required, not only that the testator must be free from physical restraint—duress (Godolphin, Orphan's Legacy, pt. 1, c. 9)—but that his soul, mind, volition, or will, that dual principle of the ego, should also be free and not coerced (Swinburne, pt. 7, § 2, 1868, L. R. 1, p. 481). It will be observed that the old technical term of testamentary law employed in this connection is "coerced." I have never seen the origin or history of the legal term "coerced" discussed, although it runs through all the modern leading cases as the one sufficient criterion of undue influence. Williams v. Gonde, 1 Hagg. 581; Wingrove v. Wingrove (1886) 11 P. D. at page 82; Children's Aid Society v. Loveridge, 70 N. Y. at page 394, and see cases cited in Re Campbell's Will, 136 N. Y. Supp. 1105, and in Re Van Ness' Will, 78 Misc. Rep. 592, 139 N. Y. Supp. at page 492. That the term "coercion' is a mere translation of Latin usage of the canonists could be easily demonstrated.

The slightest reflection will disclose that coercion, in the sense of a compulsion of the mental state of a human being, is a very different force or influence from a coercion which affects his rights to physical freedom. Of the distinction just denoted testamentary common law takes full notice. Both testamentary law and the common law assume, as already stated, the inherent right to freedom of the will and the inherent right to liberty or freedom from physical restraint. That the principle—that coercion is the ultimate test of undue influence—crept from the canonists into our testamentary law is susceptible, as I said, of demonstration.

Mr. Williams, in his most excellent compendium of the Law of Wills and Succession, p. 31, notes an admirable definition of undue influence, taken, he says, from the Roman law: "Quamvis si liber esset noluisset, tamen coactus voluit." I do not find the original of this citation, but the Roman law also required that a will must originate in the free will of the testator, and if a testator was coerced to make or alter a will, the will was voidable for this reason (D. 29, 6, 1), and the property then reverted to the fiscus. The Roman law was particularly precise and refined on principles of this character. Const. 1,

C. 6, 34. Violent or impetuous pressure, whereby a testator was swayed against his free will, vitiated a Roman testament. While the principle of wrongful coercion of a testator's will undoubtedly originated in the Roman law, any coercion was in the old spiritual courts of England, whence we derive our testamentary common law, a wrong. In those spiritual courts the term coercion had even a larger meaning. We find that Ayliffe employs it in the Parergon Juris Canonici, and Sir Matthew Hale likewise, in references to the sentences of the spiritual courts, in the general sense of restraint.

We have now arrived at a point where it may be stated generally that in probate law any wrongful interference by or on the part of a beneficiary with a testator's freedom of will, or volition, may be fatal to his testamentary act, provided such interference amounts to coercion. Brick v. Brick, 66 N. Y. at page 149; Coit v. Patchen, 77 N. Y. at page 539, and the authorities cited; Matter of Will of Van Ness, 78 Misc. Rep. at page 599, 139 N. Y. Supp. 485. To ascertain when coercion and consequent subversion of intention exist requires a very extended and refined inquiry in a probate case, and for this reason the courts allow great latitude on an issue of undue influence. In re Woodward, 167 N. Y. at page 31, 60 N. E. 233; Horn v. Pullman, 72 N. Y. 269, 276; Boyse v. Rossborough, 6 Ho. L. Cas. 42, 58; Rollwagen v. Rollwagen, 63 N. Y. at page 519.

[4] No other issue in a probate court is more subtle than undue influence, as it involves not only legal, but psychological and ethical, problems of great delicacy. See "Psychology, as Applied to Legal Evidence," by Arnold, of the Calcutta Bar, p. 156. But it will suffice to say, roughly, that a testament which results from fraud or force of any kind is in general invalid, as it is not then the expression of the testator's will. If the fraud or force clearly affect only a part of the testament, it does not necessarily invalidate the whole. But if there is doubt it may affect the whole will. Matter of Van Ness, 78 Misc. Rep. at pages 598, 600, 139 N. Y. Supp. 485.

[5] Undue influence can rarely be made out by direct evidence and hence indirect or circumstantial evidence is sanctioned by authority in support of this allegation. Rollwagen v. Rollwagen, 63 N. Y. 519, cited Matter of Van Ness, 78 Misc. Rep. 602, 139 N. Y. Supp. 485. The proofs offered in support of the allegation of undue influence in this proceeding are largely in the nature of circumstantial evidence. Circumstantial or indirect evidence may be cogent or it may be slight. It is always to be received subject to rules relating to legal relevancy. Although evidence may be logically relevant, if it is not legally relevant it cannot be received in a court of justice. In this case the testimony of the acts and conduct of those charged with the exercise of undue influence was very liberally taken, and that it was relevant to the issues raised can hardly be disputed. The character of the evidence corresponds to that always allowed in the older courts of probate, and it throws much light on the conduct and motives of those charged with conspiracy, fraud, or undue influence. That some of it is competent under the modern law of evidence applicable to jury trials I doubt, and I shall therefore reconsider it again. At common law, the common

law of evidence, it will be observed, had little relevancy to proceedings in courts of equity or probate. In re Benjamin's Will, 136 N. Y. Supp. at page 1082.

[6] But if the common law of evidence is controlling in this matter, then by that law, when the state of mind of a party with reference to a transaction at issue is material, as it is on an issue of undue influence, all acts and declarations from which it may be inferred are evidential. See In re Van Ness' Will, 78 Misc. Rep. 592, 139 N. Y. Supp. 506, 507, and cases there cited.

For many years prior to the making of the disputed will the testatrix had lived alone with a single servant in her own substantial private dwelling house in this city. Her habits had become those of an elderly recluse in a great measure, and she found her diversions and enjoyment largely within the four walls of her own dwelling. Her servant, her agents, her rents, her maladies, and her simple diversions made up the round of a monotonous existence. Among those who ministered during these years to the wants of testatrix was Mrs. Stein, the wife of the executor under the will in question. Although not related by blood, Mrs. Stein always addressed the testatrix as "Aunt," and the evidence discloses that if testatrix had a real regard for any one, or real reason for such regard, it was for Mrs. Stein, who for years assiduously cared for testatrix in sickness and in health. But during these many years it is evident that the testatrix found amusement or distraction in the society of other visitors and attendants besides Mrs. Stein. Among these others are prominent more particularly her lawyer, Mr. Quintin, and her neighbor, Mr. Leis, a butcher in the quarter long inhabited by the testatrix. Mrs. Hermann had seen Mr. Leis grow up from an apprentice boy to a man of family and business. The intimacy and intercourse between testatrix and all these persons and their connections just mentioned figures largely and with wearisome iteration in the testimony.

It is obvious from the testimony that Mrs. Stein regarded herself as a legitimate object of the bounty of testatrix and that she regarded the others as intruders. It is equally obvious that Mr. Quintin and Mr. Leis, legatees for considerable sums under an earlier testament made by testatrix, regarded Mrs. Stein and her faction as dangerous opponents. The conduct of these factions for the old woman's favor and testamentary regard figures largely in the evidence. The domestic politics of these factions, one headed by Mrs. Stein, and the other by Mr. Quintin and Mr. Leis, also figure largely in the evidence. It was apparent as the evidence developed that Mrs. Stein by herself was not a match for the other and more astute faction. Mrs. Stein seems to have been a quiet, domestic, and well behaved, but rather slow-minded, person. Certain it is that she had long ministered to the wants of the testatrix with a fidelity and care which gave her great claims on a childless old woman, without a single relative for whom testatrix cared or could care. If there was a natural object of the bounty of testatrix, it was, perhaps, Mrs. Stein. Had not one Mrs. Noll appeared on the testamentary scene, Mrs. Stein's conduct would doubtless have continued irreproachable.

It is established that, in prior testamentary papers made by testatrix, Mr. Quintin and Mr. Leis, or their families, figure as legatees, together with Mrs. Stein. By an earlier will Mr. Quintin and Mr. Leis were made the executors of Mrs. Hermann. We have this disposition of property as a datum only in this proceeding, for the validity or invalidity of the earlier testaments is not before me, and cannot be now considered. If the will now presented for probate is established, the earlier dispositions made by testatrix will, however, be revoked.

[7] The nature of earlier testamentary provisions is regarded as relevant upon an issue of undue influence; for if they are consistent with provisions of the later will they may tend to rebut the charge of undue influence, while if inconsistent and unexplained they may tend to confirm it. Ridden v. Thrall, 125 N. Y. 572, 576, 577, 26 N. E. 627, 11 L. R. A. 684, 21 Am. St. Rep. 758; Matter of Nelson, 141 N. Y. at page 157, 36 N. E. 3. The dispositions in favor of Mr. Leis and Mr. Quintin tend to show that at one time testatrix regarded them as proper objects of her bounty. The contestants contend that a sudden change of this fixed testamentary intention on the part of Mrs. Hermann was occasioned by the undue influence of Mr. and Mrs. Stein and one Mrs. Noll, co-operating or acting severally, and that the change requires more explanation in this cause than the proponents gave in evidence. While Mrs. Stein benefits by the earlier testamentary provision, she benefits more largely by the contested will. If the earlier will proves a fixed testamentary intention, it proves that Mrs. Stein, as well as Mr. Quintin and Mr. Leis, had for some long period been in the mind of testatrix as proper objects of her bounty. The earlier will affords also a locus standi to Mr. Leis to contest the will now before me for probate. Beyond this, the earlier will throws little light upon the contention now to be decided. Horn v. Pullman, 72 N. Y. 269.

For some period prior to the execution of the paper now propounded, it was apparent that Mrs. Hermann's end was approaching, and I think the evidence discloses that the resources of the factions indicated were put to a strain. The testamentary dispositions of testatrix were evidently matters of supreme interest to these factions.

[8] Before taking up the somewhat desultory evidence in detail, we may recall that upon an allegation of undue influence the declarations of those charged with its exercise become competent in varying degrees, according to the circumstances of a particular case. Rollwagen v. Rollwagen, 63 N. Y. at page 519. On this issue the way of life of testatrix and her relations with the persons said to have influenced her are competent evidence. Coit v. Patchen, 77 N. Y. 533; Boyse v. Rossborough, 6 Ho. L. Cas. 42, 58; Rollwagen v. Rollwagen, 63 N. Y. at page 519. In Rollwagen v. Rollwagen it is stated without reservation or qualification that "the acts and declarations of such persons wielding the influence" may be shown on this issue. No distinction is drawn between declarations prior to the act of will or subsequent thereto. No distinction is made between declarations part of a competent res gestæ, or naked declarations. Why should there be, as a party is judged out of his mouth? I have always been guided by this express statement, although, if left to myself, I would have, perhaps,

been inclined to limit the competent declarations of such persons to those which were a part of a competent res gesta, or else competent admissions or declarations against interest.

In the early part of the year 1912, which was the year the contested will was made, there appeared at the dwelling of testatrix one Beatrice Noll, a German woman of marked criminal antecedents and before this time an entire stranger to Mrs. Hermann. The criminality of the antecedents of Mrs. Noll are only important in so far as they go to the weight of her testimony. Her proneness to sin cannot be used in this case as a basis of undue influence. Mrs. Noll came into Mrs. Hermann's house ostensibly as a dressmaker, employed by Barbara Hecht, the solitary servant for many years of Mrs. Hermann's domestic establishment. Barbara Hecht had made Mrs. Noll's acquaintance by meeting her by chance in the street. Through the kitchen Mrs. Noll soon ascended to a most extraordinary familiarity and influence with old Mrs. Hermann herself. It is established that it was Mrs. Noll's lawyer and personal acquaintance who superintended the drafting and the execution of the paper propounded, which would carry to Mrs. Noll a substantial part of Mrs. Hermann's estate. The lawyer in question had, it seems, defended Mrs. Noll in a criminal case, and prior to the act of will had no acquaintance with Mrs. Hermann, the alleged testatrix. It is incidentally admitted that on the occasion of making the will in question this lawyer brought to Mrs. Hermann's respectable house a strange young woman whom he then represented to be his wife, contrary to the fact. This is only significant to refute presumptions arising by reason of the attendance of a lawyer licensed to practice his profession in this state. I cannot forbear to consider that it was under such unusual auspices the will propounded came into being.

[9] On the direct examination the lawyer in question was asked by proponent's counsel calling him, without objection, whether he had ever been charged with crime, and he stated that he had. On cross-examination by contestants' counsel, the lawyer was asked, over objection of one counsel for proponents, if he had been indicted. The two counsel for proponents acted together on the trial, except in this one instance. Only in view of the direct evidence was the cross-question allowed. Otherwise it would not have been allowed, as I was quite aware that a witness may not on cross-examination for the first time be asked if he has been indicted. Van Bokkelen v. Berdell, 130 N. Y. 145, 29 N. E. 254; Hirschman v. Cohn, 38 App. Div. 351, 56 N. Y. Supp. 602. But where the lawyer had volunteered the statement made on direct examination, I do not understand that he may not in his cross-examination be asked the particulars of what he had admitted or waived and volunteered. But I will ignore this evidence of the indictments in my conclusion, so as to avoid further contention on that point. The lawyer who took instructions for the will admitted that he did not draw the will himself, but had engaged counsel to draft the will from his dictation. His memoranda he had destroyed. He admits that he was not versed in the law of wills. Thus in this case the presumption of regularity in the execution of a will, which arises from the presence and attendance of a highly respectable and competent

150 N.Y.S.—9

lawyer, is much affected when we come to its application to the facts disclosed by the evidence.

That some of the legatees mentioned in the will now offered for probate were highly respectable people and no parties to the making of the will is apparent, but the title of all the legatees depends in this case, not only on the regularity of the execution, but on the capacity of the testatrix and her freedom from all manner of coercion by Mrs. Noll, Mrs. Stein, and their agents or abettors. It would seem apparent that the respectable Mrs. Stein had some reason to think that the sudden entrance of the mysterious Mrs. Noll into the household, the most private affairs, and even the testamentary act, of the aged testatrix, was, to say the least, highly peculiar. Nevertheless Mrs. Stein made common cause with Mrs. Noll. For many years Mrs. Hermann, the testatrix, had conducted her business through other channels than those employed on the occasion of the will propounded. All her old agents, one by one, disappeared when Mrs. Noll came on the scene. Mrs. Stein doubtless distrusted these old agencies as inimical, and possibly not without reason; but this did not, I think, justify the ensuing intimacy or the alliance and co-operation for some purpose between so highly respectable a woman as Mrs. Stein and such an extraordinary interloper as Mrs. Noll. But whether this inference is justifiable or not, certainly in this case, if there is any presumption to be raised against one of these women, it unfortunately extends to both, for they often acted together. Before considering at large the evidence of the witnesses before me on the issue of undue influence, let me advert to the nature of the evidence concerning the act of execution. It is necessary that the undue influence charged be connected in some way with the testamentary act in controversy.

[10] It was said in Rollwagen v. Rollwagen, 63 N. Y. at page 519, that undue influence "can be shown by all the facts and circumstances surrounding the testator, the nature of the will, his family relations, the condition of his health and mind, his dependency upon and subjection to the control of the person supposed to have wielded the influences, the opportunity and disposition of the person to wield it *and the acts and declarations* of such person." Here the general declarations of persons charged with such influence are expressly declared to be competent on an issue of undue influence. If, as here, such a person is also one of several legatees, does that additional fact exclude his declarations, at least if part of competent res gestæ? Matter of Baird, 47 Hun, 77, holds that it does exclude them, and while I can find no express adjudication of the Court of Appeals on the point, I must follow the decision in Matter of Baird. But to this point I shall refer later.

When we come to the ceremonial required by the statute of wills for the formal execution of a solemn testament, we find it unquestioned that there was a substantial compliance with the statute. The statute of wills requires what is technically known as rogatio testium, or a request from the testatrix to the attesting witnesses to act as such. Tarrant v. Ware, note, 25 N. Y. at page 425; Neugent v. Neugent, 2 Redf. Sur. 369; Matter of Lyman, 14 Misc. Rep. 352, 36 N. Y.

Supp. 117; Burke v. Nolan, 1 Dem. Sur. 436, 440; Matter of Kivlin, 37 Misc. Rep. 187, 74 N. Y. Supp. 937.

[11] We must observe in this case that in the first instance the summons to the attesting witnesses to attend the execution of the will offered was not made by testatrix herself, but by the persons implicated by the allegation of undue influence. This in itself is not in all cases fatal, if the testatrix ultimately or thereafter requested such witnesses, being present, to sign their names as witnesses at the end of her will. But as attesting witnesses to a will are placed as safeguards about an intending testatrix, the omission of an original summons by her to them in the first instance, and its delegation to the very persons implicated in the charge of contestants, is unfortunate in this particular case. It is not necessary in a probate case to connect all the attesting witnesses with conspiracy or the undue influence charged. Even persons of high character may be employed, and yet fail to do their duty on such an occasion. Here the attesting witnesses testify to a substantial compliance with the statute of wills by testatrix in the act of execution, but this does not in this case refute the proof of undue influence over her.

[12] Indeed, there is very significant testimony in the record by one attesting witness which tends to support the charge that this will was not that of testatrix, if we bear in mind the character of the lawyer superintending the execution and his relations to Mrs. Noll and the summoners of the attesting witnesses. This particular attesting witness referred to swears that at the session when the paper propounded was presented for execution and before its subscription the witness said:

"I do not know whether I am in order or not, but in medical circles we say: Is the paper open for discussion?"

The lawyer in attendance replied in substance that it was, and then a colloquy ensued which resulted in a legacy being given to a hospital in which the attesting witness in question was interested. If the aged Mrs. Hermann was uninfluenced by any one in her testamentary dispositions, as claimed by the proponents, this was a most extraordinary proceeding on the part of an attesting witness and the lawyer; for the paper as drawn, if it truly reflected the confidential instructions of testatrix to her lawyer, was not open on that occasion for further discussion by the attesting witnesses. This one undisputed instance to my mind shows, as conclusively as any other item of testimonial evidence, not only that testatrix was easily influenced in her testamentary dispositions, but also that neither the lawyer nor the attesting witnesses were proper safeguards to her, or had a proper sense of their own responsibility on so important an occasion as that of the execution of a last will and testament by an old and isolated woman of property.

The allegation of undue influence is sought to be established, not only by the acts and conduct, but also by the declarations and admissions of Mrs. Beatrice Noll, one of the legatees named in the disputed will. Some of these declarations or admissions were admitted, it will be observed, over objection, but only after such evidence had first been taken without objection. I esteem it to be incumbent on me to inquire again

how far such evidence is competent, in order that, if incompetent, it may be disregarded in my conclusion, and not operate prejudicially to the parties before me. If competent, such evidence, standing alone, tends to establish that the will in controversy was the result of undue influence exerted by Mrs. Noll. If incompetent, whether there is sufficient evidence of the undue influence charged without these admissions and declarations will then remain for consideration. So much of this evidence as was taken without prior objection must stand in the orderly course of procedure.

[13] It is a very old rule of evidence that statements made by a party to a proceeding, if they tend to prove his adversaries' case, are admissible in evidence as admissions. Maltby v. Christie, 1 Espinasse, 395. But this rule is subject to exceptions. It is said in this state that the admissions of one legatee, *made prior* to the execution of the will, are incompetent as against other legatees, parties to the proceeding and interested in the result. Matter of Myer, 184 N. Y. 54, 76 N. E. 920, 6 Ann. Cas. 26; Matter of Kennedy, 167 N. Y. 163, 177, 60 N. E. 442; In re Benjamin's Will, 136 N. Y. Supp. 1070, 1080; Matter of Baird, 47 Hun, 77. Matter of Baird does not seem to contain a very exhaustive discussion of principle, but it is express enough. In Matter of Myer, 184 N. Y. 54, 76 N. E. 920, 6 Ann. Cas. 26, the issue of undue influence was not, however, tried out, and the case turned upon the capacity of testatrix. Matter of Kennedy was a proceeding to establish a will lost or destroyed. The admissions and declarations of one legatee were rejected as inadmissible against the others on the issues actually presented.

In this proceeding before me the admissions and the declarations of Beatrice Noll were those of one not only a legatee, but of one charged with conspiracy and the exercise of undue influence. Some of them were made before the will in controversy, others *after* it. Mrs. Stein is also charged with the exercise of undue influence and with conspiracy. There is no written allegation of conspiracy between Mrs. Noll and Mrs. Stein. But such conspiracy was claimed on the trial. Whether a charge of undue influence by more than one person over testatrix in respect of her will, which is a single and indivisible act, is not implicitly a charge of conspiracy I have some doubt. But, if it is, no overt conspiracy was ultimately shown by contestant, and the case must turn on other points. Undue influence may be doubtless exercised by several persons at the same time, singly and without an overt conspiracy or co-operation.

[14] But, if a conspiracy is implicitly charged, the conspiracy must be proved at some stage of the case before the declarations of one conspirator are evidential against the other. Then they are competent only when part of a relevant res gesta or when made in furtherance of the common object. No other rule of evidence is, I think, better settled than this. If Mrs. Noll's proposal to Mr. Leis to join with her in making a fraudulent will for testatrix was in furtherance of this conspiracy or of a similar conspiracy, or if it was subsequently ratified by the Steins, it would, perhaps, be competent.

[15] In a court of this character the conspiracy need not be first established before declarations of co-conspirators are received; it suf-

fices if the conspiracy is made out at any stage of the case. If the conspiracy is not established, the declarations of co-conspirators are then to be disregarded.

[16] When an issue of conspiracy arises in a probate case, other acts besides the conspiracy to procure the will are also provable; thus wrongful acts or schemes to obtain other property of the testatrix than her will may be given in evidence. I had occasion to notice the authorities on this point in Matter of Gannon, 73 Misc. Rep. at page 326, 132 N. Y. Supp. 712. Thus it happens in this case that on one plea or another contestants were at first allowed a larger latitude of evidence than the ultimate proofs sanctioned by the strict common law of evidence relative to jury trials. But no harm to proponents can result by such course in this court, for such proofs will now, when incompetent, be disregarded. In a court of probate, as in all courts originating in the civil law, a larger latitude of evidence is sanctioned than the common-law rules of evidence relative to trials in pais sanction. When there is a jury, the presiding judge, by the common-law system, is bound to see to it that no evidence not relevant to the precise issue is placed before the jury, or, if it is, he must direct them to ignore it before they retire for deliberation or reach a verdict. In this case I do not think an overt conspiracy between Mr. and Mrs. Stein and Mrs. Noll and Mrs. Noll's lawyer was at any time made out during the trial, notwithstanding the testimony of Louisa Hutter, and I shall therefore ignore in my conclusion all the declarations of such persons when made to third persons and not in the presence of Mrs. Hermann.

If a declaration of a co-conspirator is part of a competent res gesta —that is, of an act or conduct relative to the issue of conspiracy—I think the declaration is clearly competent, notwithstanding the conspirator making it is a legatee and his mere admissions are ruled out by the cases. Matter of Wheeler, 5 Misc. Rep. 279, 286, 25 N. Y. Supp. 313; Matter of Will of Budlong, 54 Hun, 131, 7 N. Y. Supp. 289, 290. But I am inclined to think the charge of conspiracy has not been made out in this case, and so I will disregard in my conclusion all declarations of Mrs. Stein or Mrs. Noll not in the presence of the testatrix. Having treated them as naught, the conclusion will not be be predicated of them, and thus any possible error on the ground of the admissions of such declarations will be avoided.

But there is another question. If the declarations of Mrs. Noll to the various witnesses called to the stand are not competent as declarations of a conspirator against co-conspirators, are they then receivable as admissions? Doubtless, had Mrs. Noll been a sole legatee, her admissions against her interest would be receivable in this as in any other litigation. But she was not the sole legatee, and it is urged that as admissions her declarations ought not to be received on that ground in this case. Abstractly this contention may be right under the rulings in this state. To avoid controversy I shall ignore in the conclusion all such evidence as relates to the admissions of Mrs. Noll or Mrs. Stein made to third persons not in the presence of Mrs. Hermann. Thus any error on this head will not affect the conclusion reached.

[17] Most of the declarations of the testatrix herself were given in evidence without objection. The contents of such declarations are not

proof of the truth of the fact stated, for that would be hearsay. Smith v. Keller, 205 N. Y. 39, 98 N. E. 214; Marx v. McGlynn, 88 N. Y. 357, 374; Waterman v. Whitney, 11 N. Y. 157, 62 Am. Dec. 71. They are admissible for the purpose of proving the condition of testator's mind. They are entitled to no weight as proof of undue influence. Marx v. McGlynn, 88 N. Y. at page 374; Matter of Woodward, 167 N. Y. 28, 60 N. E. 233. While not competent to prove acts of others amounting to undue influence, such declarations are, however, competent, as I have before stated, to show the operation such acts had on the mind of a testator. Cudney v. Cudney, 68 N. Y. 148.

We come now to the consideration of the actual proofs on the issue of undue influence, without the admissions and declarations of Mrs. Noll and Mrs. Stein. It is not enough to show an opportunity to commit the offense charged. The offense itself must be made out by relevant or direct evidence. I think it is so made out. It is an extraordinary circumstance, and one established, that the comparative stranger to testatrix, Mrs. Noll, had much to do in the creation of the paper propounded. What is still more extraordinary, and established, is that she is named as a legatee in the same paper for a large amount. How was this brought about? These are circumstances which require more justification than the record affords, in view of other circumstances established. Mrs. Noll was not employed about Mrs. Hermann's dwelling house; she had no labor to perform there, and no business in the dwelling, apparently, other than the new and old wills of Mrs. Magdalena Hermann; at least, this was her main business. The old servant of Mrs. Hermann tried to eject Mrs. Noll as an unworthy intruder. What an extraordinary testamentary situation these bare facts disclose, for it certainly is extraordinary that an entire stranger to the aged testatrix should be allowed to meddle at all with the last will and testament of the alleged testatrix. Mrs. Hermann, it will be remembered, had been testate before she knew Mrs. Noll, and there is evidence that her prior will was long satisfactory to herself. The testimonial evidence of Barbara Hecht, Mrs. Stein herself, and Mrs. Amelia Hermann discloses how it came about that testatrix changed her will and attempted to make a new will. Testatrix became prejudiced against Quintin and Leis by reason of the acts and conduct of Mrs. Noll and Mrs. Stein. The contents of the old will in their favor were, for this purpose, misrepresented to testatrix. New sheets appeared in the old will, certainly not inserted by Leis and Quintin, for the prior will was not in their custody. Mrs. Hermann believed Quintin or Leis, or both, so arranged the old will. The belief that Leis and Quintin took her whole estate under the old will was a material inducement to Mrs. Hermann to execute a new will. Mrs. Stein and Mrs. Amelia Hermann so stated on the stand.

[18] If the old servant Barbara Hecht is to be believed, and she is not adequately contradicted in this, nor is she discredited as a witness, additional or extra sheets were inserted in the old will to carry out this scheme, and Mrs. Hermann was induced to believe that this was done by her prior legatees, Leis and Quintin. The effect which the misrepresentations had on the aged testatrix are competently proved by Mrs. Hermann's own declarations. Cudney v. Cudney, 68 N. Y.

at page 152. They establish that testatrix was induced to believe that by her prior will Quintin and Leis took her whole estate, which was not the fact. Mrs. Stein herself testified as well as Mrs. Amelia Hermann, that Mrs. Magdalena Hermann so believed. There is no doubt from the evidence that Mrs. Hermann's mind was thus unfairly prejudiced, in and about her act of will, against Mr. Leis and Mr. Quintin, her prior legatees, by misstatements of fact made by those charged with the exercise of undue influence. This, under the decision in the case of Budlong's Will, 126 N. Y. 423, 27 N. E. 945, is sufficient proof in itself of undue influence. The mind of testatrix was coerced by misrepresentations. I have brought my ruling within the decision in Matter of Will of Kindberg, 207 N. Y. 221, 100 N. E. 789, which I followed in Matter of Will of Falabella, 139 N. Y. Supp. 1003, placing the burden of proof on those alleging a plea of undue influence. The contestants have here sustained the burden of proof on the issue of undue influence.

In this particular case any evidence of an imposition upon the testatrix in respect of her act of will, if uncontradicted, ought to be sufficient proof of undue influence, as the aged testatrix is not proven to have had the benefit of disinterested and respectable legal assistance in the act of will, nor did she have the safeguards about her of circumspect and entirely neutral attesting witnesses. Two of the attesting witnesses were procured by Mrs. Noll and Mrs. Stein. One of them was instrumental in bringing about a particular legacy. He thus made himself an actor, not a witness.

[19] I could, I think, refuse probate according to probate law on the additional ground that the proponents have not sustained the burden resting on them to show satisfactorily that the instrument propounded was the last will and testament of Mrs. Hermann. In Rollwagen v. Rollwagen, 63 N. Y. at page 517, it was said on the plea of undue influence that:

"A party who offers an instrument for probate as a will must show satisfactorily that it is the will of the alleged testator, and upon this question he has the burden of proof. If he fails to satisfy the court that the instrument speaks the language and contains the will of the testator, probate must be refused."

I cannot, for the reasons stated by me in Re Tod, 85 Misc. Rep. 298, 147 N. Y. Supp. 161, 164, 165, think that this judgment was intended to be overruled by Matter of Will of Kindberg, 207 N. Y. 221, 100 N. E. 789, although if the burden of proof of undue influence is on a contestant, as said in the Kindberg Case, it cannot at the same moment be on proponent, as said in the Rollwagen Case. The fact is that in probate cases there is a great discrepancy in many of the decisions on the subject of burden of proof, as I attempted to show in my judgment in Re Gedney's Will, 142 N. Y. Supp. 157. So much so is this the fact that in Indiana I observe, after great fluctuations, they have gone back to the old established doctrine of probate law, that the final burden of giving preponderating proof on most issues in a probate case rests on the proponent of the will. Herring v. Watson (Ind. Sup.) 105 N. E. 900; McReynolds v. Smith, 172 Ind. 336, 86 N. E. 1009.

I cannot believe that the recent ruling on the burden of proof in probate cases was intended in any event to disturb the doctrine of Howland v. Taylor, 53 N. Y. 628, and Rollwagen v. Rollwagen, 63 N. Y. at page 517, that before a will is admitted to probate the surrogate must be satisfied that it is the will of the testator. I referred to this point in Re Van Ness' Will, 78 Misc. Rep. 592, 139 N. Y. Supp. page 521. But as this particular point is not now necessarily here, and the judgment need not rest on it, I will not discuss it at large.

For the other reasons already stated by me, probate of the paper propounded is refused. Settle decree accordingly.